NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0385n.06
Filed: June 27, 2008

No. 07-5303

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

TONY L. EVANS,

    Plaintiff-Appellant,

v.

PROSPECT AIRPORT SERVICES, INC.,

    Defendant-Appellee.

                        /

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE

BEFORE:    SUHRHEINRICH, CLAY, and COOK, Circuit Judges.

    **CLAY, Circuit Judge.** Plaintiff, Tony L. Evans ("Evans"), appeals the district court's grant of summary judgment in favor of Defendant, Prospect Airport Services ("Prospect"), on Evans' unlawful retaliation claim brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (2000). In particular, Evans challenges the district court's determination that he has not demonstrated a *prima facie* case of retaliation due to his failure to produce evidence of a causal link between his filing of complaints with the Equal Employment Opportunity Commission ("EEOC") and Prospect's termination of his employment. For the reasons that follow, we **AFFIRM** the judgment of the district court.

**I. BACKGROUND**

## A.    Factual Background

Prospect provides skycap, wheelchair, and other passenger services at various airports across the country. From August 29, 2001 through November 9, 2005, Evans, an African-American male, was employed by Prospect as a passenger service assistant at Nashville International Airport. In this capacity, Evans helped elderly or disabled airline passengers get into wheelchairs and then escorted them to and from gates within the airport. Evans was supervised in his duties by Robert Strobel ("Strobel"), one of Prospect's employee managers, and by Kathy Lawson ("Lawson"), an assistant manager.

During the first two years of his employment, Evans received only two written warnings for job performance issues. On November 29, 2002, Strobel issued Evans a written warning for starting his shift early in violation of Prospect's policies. Likewise, on November 19, 2003, Strobel gave Evans a written warning for failing to wear the proper uniform.

On May 25, 2004, Strobel issued Evans a third written warning for violating Prospect's dress code policy. On the same day, Evans filed a complaint with the EEOC alleging that, during the course of his employment with Prospect, he had been discriminated against because of his race. Specifically, Evans claimed that, because of his race, (1) he had been denied pay for some of the hours that he had worked, and (2) he had been required to pay for his own work uniform while others were not. As a result of this EEOC charge, Prospect subsequently performed a complete audit of Evans' time records from August 2001 to July 2004 and sent Evans a check for $179.25 in back wages.

During the months following Evans' May 24, 2004 EEOC complaint, Prospect issued Evans several written warnings for a variety of performance deficiencies, the factual basis for some of which Evans has contested.

On June 11, 2004, Strobel issued Evans a written warning for (1) calling in after his shift began to inform Strobel that he would be late, and (2) ultimately failing to show up to work. The warning letter informed Evans that "if this happens again disciplinary actions will be taken." J.A. at 346.

On July 23, 2004, Lawson sent Evans a written warning, which was followed by a three-day suspension, for wearing jewelry on the outside of his uniform in violation of Prospect's policies. The warning/suspension letter noted that Evans had been given "several verbal warnings" about wearing jewelry outside his uniform and requested that Evans simply "put [his] necklaces inside [his] shirt and not hanging on the outside of [his] uniform." J.A. at 347. At his deposition, Evans admitted that he had received this warning and suspension, but denied that he had received any prior verbal warnings. Evans further indicated that he felt the disciplinary action was unfair and retaliatory because, according to Evans, he had worn his jewelry in that fashion since he started working for Prospect and had never been requested to take it off.

On July 26, 2004, Lawson issued Evans another written warning and three-day suspension for the "use of racial remarks toward his co-workers" while talking on Prospect's airport radio communications system. J.A. at 348. Later that same day, Lawson sent Evans a letter indicating, that, after having consulted with Ronald Claypool, Prospect's Human Resources Manager, she had decided to reduce the suspension to one day. At his deposition, Evans acknowledged that he had

referred to his co-workers as "foreigners" or "foreign guys," but stated that he felt his comments were not "racial remarks" and were not inappropriate. J.A. at 199-200.

On September 3, 2004, Strobel allegedly issued Evans a written warning for pushing wheelchairs before his shift began. According to Strobel, when he informed Evans that he was about to give Evans a written warning, Evans became "very loud and started yelling at" Strobel. J.A. at 350. For this alleged insubordination, Evans was also given another one-day suspension. At his deposition, Evans testified that he did not recall ever receiving such a warning and denied that the underlying event occurred.

On September 29, 2004, Strobel issued yet another written warning to Evans for using his cell phone while pushing a passenger in a wheelchair and for failing to fasten the passenger's seatbelt. The warning letter purported to remind Evans that talking on the cell phone while pushing wheelchairs and failing to fasten passenger seatbelts is against Prospect's policies. The letter also noted that Evans was the only wheelchair pusher who had customers refusing to wear seatbelts and informed Evans that "this needs to change." J.A. at 353. At his deposition, Evans denied that he was pushing a passenger when he was seen talking on his cell phone and instead claimed that he was being singled out for punishment because, according to Evans, many other employees use their cell phones at work. Evans did concede, however, that he had not followed company policy with regard to the seatbelt issue.

On October 21, 2004, a female co-worker lodged a sexual harassment complaint against Evans with Prospect's Human Resources Department alleging that Evans had made a statement in her presence about having "only had one other white woman." J.A. at 61, 77. On October 25, 2004,

Claypool called Evans as part of his investigation of the complaint. According to Claypool, Evans refused to discuss the incident and hung up the phone. As a result of this alleged failure to cooperate with the harassment investigation, Claypool placed Evans on a five-day suspension, but informed Evans that the suspension would end immediately if Evans were willing to cooperate with the investigation. On October 29, 2004, Claypool sent a letter to Evans informing him that no clear determination could be made on the sexual harassment allegation and that he could return to work on November 1, 2004. At his deposition, Evans challenged Claypool's account of their conversation. Evans testified that he first denied making the alleged comment, then informed Claypool that he didn't want to discuss the matter further, and finally hung up the phone.

On November 1, 2004, the same day on which he returned to work following this five-day suspension, Evans filed a second EEOC complaint alleging that he was being retaliated against for filing his first complaint by way of the numerous suspensions and written warnings listed above.

In the months following this second EEOC complaint, Evans again received written warnings and suspensions for performance issues. On November 4, 2004, Strobel issued Evans a written warning for wearing excessive jewelry in violation of Prospect's uniform policies. Likewise, on December 21, 2004, Strobel issued Evans a five-day suspension for pushing a wheelchair passenger in a moving walkway in violation of both Prospect's and the airport's policies. The suspension letter further informed Evans that "any future infractions of Rules and Regulations will require stronger disciplinary actions to be taken and such disciplinary actions can include termination of your employment." J.A. at 355. At his deposition, Evans admitted to having pushed the wheelchair

5

passenger on the moving walkway, but claimed that he did not know this was a violation of airport policy despite the fact that signs prohibiting such behavior are posted near each walkway.

On the same day as he received this five-day suspension, Evans filed a third EEOC complaint alleging new instances of race discrimination and unlawful retaliation. In particular, Evans claimed that his five-day suspension for pushing a wheelchair on the moving walkway was discriminatory. A few months later, Evans was again issued several written warnings for performance deficiencies, which culminated in his ultimate discharge on November 9, 2005.

On April 27, 2005, Lawson issued Evans a written warning for failure to meet a wheelchair passenger at her gate. Because of Evans' alleged belligerence and insubordination when Lawson presented him with the disciplinary letter, Evans was suspended from work for the rest of that day without pay. Due to Prospect's further review of Evans' actions, he was also released from work, with pay, on April 28, 2005, but returned to work on May 2, 2005.

On November 2, 2005, Prospect issued Evans his final disciplinary suspension. That morning, Claypool and Strobel observed Evans pushing an elderly female passenger in an Southwest Airlines wheelchair that did not contain a seatbelt, in violation of Prospect's policies.[1] As they walked towards Evans to confront him about this violation, Evans allegedly approached them in an aggressive manner complaining loudly about Strobel's wheelchair assignments. In doing so, Evans left the passenger unattended in the wheelchair without locking the wheels, again in violation of

---

[1] In his brief on appeal, Evans disputes whether his use of a Southwest Airlines wheelchair was in violation of Prospect's policies. However, at his deposition, Evans admitted that he knew that transporting a passenger in a Southwest wheelchair, which did not contain a seatbelt, was against Prospect's policies.

Prospect's safety policies. When Claypool asked Evans about these observed violations, Evans refused to talk and walked away. For Evans' alleged insubordination during this incident, Claypool suspended Evans.

On November 9, 2005, Prospect terminated Evans' employment for his repeated violations of company safety policies and his insubordination. The termination letter sent to Evans provided five specific incidents of unacceptable behavior as justification for the termination: (1) Evans' failure abide by the seatbelt policy on September 24, 2004; (2) Evans' failure to cooperate with Claypool's investigation of the sexual harassment charge on October 25, 2004; (3) Evans' use of a wheelchair on a moving walkway on December 21, 2004; (4) Evans' insubordination toward Lawson on May 2, 2005; and (5) Evans' wheelchair safety violations on November 2, 2005.

## B.     Procedural History

On May 9, 2005, prior to his termination, Evans filed the instant suit against Prospect in the United States District Court for the Middle District of Tennessee. In his amended complaint, filed on December 1, 2005, Evans alleged that Prospect had violated his civil rights by: (1) unlawfully discriminating against him on the basis of his race, in violation of both the anti-discrimination provision of Title VII, 42 U.S.C. § 2000e-2, and Section 1981 of the Civil Rights Act of 1991, 42 U.S.C. § 1981; and (2) unlawfully retaliating against him for engaging in protected activity, in violation of the anti-retaliation provision of Title VII, 42 U.S.C. § 2000e-3.

On August 21, 2006, Prospect filed a motion for summary judgment on all of Evans' claims. After receiving Evans' response, the district court granted Prospect's motion on February 13, 2007. *See Evans v. Prospect Airport Servs., Inc.*, No. 3:05-0368, 2007 WL 509078, at *1 (M.D. Tenn. Feb.

7

13, 2007). The district court found that Evans had produced insufficient evidence to persuade a rational jury to find in his favor on either his race discrimination claim or his retaliation claim and accordingly entered judgment in favor of Prospect. *See id*. at \*10. With respect to the retaliation claim, the district court found that Evans had produced insufficient evidence to demonstrate that a causal connection existed between the filing of his EEOC complaints and Prospect's termination of his employment. *See id*. at \*5-6.

On March 13, 2007, Evans filed this timely appeal. On appeal, Evans has only challenged the district court's disposition of his Title VII retaliation claim, thereby waiving any objection to the district court's resolution of his race discrimination claim.

## II. DISCUSSION

### A. Standard of Review

We review a district court's grant of summary judgment *de novo*. *Arendale v. City of Memphis*, 519 F.3d 587, 593 (6th Cir. 2008). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Arizona v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its initial burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. When the moving party has carried forward this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The non-moving party may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 586; *accord* Fed. R. Civ. P. 56(e)(2).

After the parties have presented the evidence, "the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party. *Matsushita,* 475 U.S. at 587. However, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the" non-moving party. *Anderson*, 477 U.S. at 252.

**B.     Analysis**

Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII] or because he has made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing" allowed for by Title VII. 42 U.S.C. § 2000e-3(a). Absent direct evidence of unlawful retaliation, claims brought pursuant to this provision are subject to the tripartite burden-shifting framework first announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008). Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of retaliation by a preponderance of the evidence. *See Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Burdine*, 450 U.S. at 253; *McDonnell Douglas*, 411 U.S. at 802. Finally, if the defendant succeeds in providing such a reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for retaliation. *See Burdine*, 450 U.S. at 253; *McDonnell Douglas*, 411 U.S. at 804. Although the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant intentionally retaliated against the plaintiff remains at all times with the plaintiff. *See Burdine*, 450 U.S. at 256.

To establish a *prima facie* case of unlawful retaliation under Title VII, the plaintiff must demonstrate that: (1) he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took a materially adverse action against the plaintiff or subjected the plaintiff to severe and pervasive retaliatory harassment; and (4) there was a causal connection between the protected activity and the materially adverse action. *See*

*Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000); *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) (modifying the third element of the *prima facie* case to require a "materially adverse" action rather than an "adverse employment action"); *see also Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 736 (6th Cir. 2006). This "burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)).

In the instant case, Evans has clearly established the first three elements of a *prima facie* case for unlawful retaliation – *i.e.*, Evans' employment was terminated (a materially adverse action) at some point in time after Prospect had become aware that he had filed EEOC complaints (activity protected under Title VII). However, the parties disagree about whether Evans has presented sufficient evidence for a rational jury to infer a causal connection between his filing of the EEOC complaints and Prospect's termination of his employment. On *de novo* review of the record, we agree with the district court that Evans has failed to present sufficient evidence to demonstrate causality, and according hold that Prospect is entitled to summary judgment on Evans' retaliation claim.

To demonstrate a causal connection between a materially adverse action, such as termination, and the exercise of protected rights, "a plaintiff must proffer evidence sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). Generally, mere temporal proximity between an assertion of Title VII rights and a

materially adverse action without other indicia of retaliatory conduct is not sufficient to establish the causal connection element of a retaliation claim. *See Aerendale*, 519 F.3d at 606; *Michael*, 496 F.3d at 596; *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007); *Randolph*, 453 F.3d at 737; *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363-64 (6th Cir. 2001); *Nguyen*, 229 F.3d at 566-67; *Johnson v. University of Cincinnati*, 215 F.3d 561, 582-83 (6th Cir. 2000). However, we have recently clarified that, in a small subset of cases, temporal proximity alone may be sufficient to establish causality:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey*, 516 F.3d at 525 (finding temporal proximity alone to be sufficient when the defendant fired the plaintiff on the same day in which it learned that the plaintiff had filed an EEOC complaint); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that some cases have "accept[ed] mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality" but that they have only done so when the temporal proximity is "very close"); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (finding that temporal proximity of three months was "significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying [the plaintiff's] burden of demonstrating a prima facie case"); *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) ("[T]his Circuit has embraced the premise that in certain distinct cases where temporal proximity

between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise."). Beyond temporal proximity, other indicia of retaliatory conduct would include evidence that the plaintiff was treated differently, either less positively or more negatively, than similarly situated employees who had not exercised Title VII rights, *see Moore v. KUKA Welding Systems & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999), or evidence that the plaintiff was subjected to closer disciplinary scrutiny after exercising Title VII rights. *See Little*, 265 F.3d at 364-65.

In the instant case, we find that Evans has not produced sufficient evidence for a jury to reasonably infer a causal connection between the filing of his EEOC complaints and his subsequent termination. First, we are not convinced that the timing of Evans' termination is sufficient to give rise to an inference of causation. Prospect terminated Evans on November 9, 2005, almost a year after he filed his third EEOC complaint and over seventeen months after the filing of his initial EEOC complaint. As opposed to the immediate firing of the employee in *Mickey*, the more lengthy gap in time between Evans' filing of his EEOC complaints and Prospect's eventual termination of his employment does not, by itself, create a reasonable inference of retaliation.

Moreover, other than Evans' own conclusory allegations and the somewhat, but not very, close temporal proximity of his termination to the dates of his three EEOC complaints, Evans has offered no evidence to suggest that he was fired in retaliation for his filing of the EEOC complaints. Evans claims that indicia of retaliatory conduct can be found in Prospect's lack of justification for the numerous disciplinary actions which led to his termination and the fact that they constitute unfair increased disciplinary scrutiny. However, Evans fails to present evidence to support such arguments.

13

Indeed, as noted above, Evans has conceded the validity of most of Prospect's charged disciplinary violations. With respect to those disciplinary actions whose validity he contests, Evans has neglected to identify any aspects of them, other than their timing, that would suggest that they were motivated by a desire to retaliate against him. Likewise, Evans has failed to produce any evidence to suggest that his workplace conduct was being more closely scrutinized than similarly situated employees who had not filed EEOC complaints. Although Evans claims that the increased frequency of the warnings and suspensions he received after filing his EEOC complaints demonstrates that he was being disciplined more often than others, Evans has provided no evidence of Prospect's disciplinary actions against other employees to enable the jury to make such a comparison. In short, rather than setting forth specific facts which would justify an inference of causation, Evans has only offered unsupported allegations that he was retaliated against on account of his filing of EEOC complaints.

Accordingly, we are compelled to conclude that Evans has failed to meet his burden of producing *at least some* evidence to suggest that his termination on November 9, 2005 was causally connected with the EEOC complaints which he filed on May 24, 2004, November 1, 2004, and December 21, 2004. As Evans has not established this fourth element of a *prima facie* case of Title VII retaliation, we hold that Prospect is entitled to summary judgment on Evans' retaliation claim.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.